# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ruben Castillo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 1904 | **DATE** | 5/17/2000 |
| **CASE TITLE** | Annamarie Quela, et al. vs. Payco-General American Credits | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 6/1/2000 at 9:45 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ■ Jury Trial set for 7/17/2000 at 10:00 A.M..

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Judgment is entered in favor of the plaintiffs and against the defendants on liability. The Court will retain jurisdiction for the sole purpose of determining the appropriate damages to be awarded to each plaintiff. Defendants' motion for summary judgment on the plaintiff Michael Hakim's claims [48-1] is hereby denied as moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | number of notices | **Document Number** |
|---|---|---|---|---|---|
| | No notices required. | | | | |
| | Notices mailed by judge's staff. | | | MAY 18 2000 | |
| | Notified counsel by telephone. | | | date docketed | |
| ✓ | Docketing to mail notices. | | | | 54 |
| | Mail AO 450 form. | | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | | |
| RO | courtroom deputy's initials | | Date/time received in central Clerk's Office | date mailed notice | |
| | | | | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ANNAMARIE QUELA, SHELBY MIGNAULT, TABATHA IRVIN, and MICHAEL HAKIM | ) ) ) | |
| Plaintiffs, | ) ) | No. 99 C 1904 |
| v. | ) ) | Judge Ruben Castillo |
| PAYCO-GENERAL AMERICAN CREDITS, INC. and OSI, INC. | ) ) ) | |
| Defendants. | ) | |

DOCKETED

MAY 1 8 2000

## MEMORANDUM OPINION AND ORDER

This opinion deals with the serious issues of witness tampering, the creation of false witness statements, and perjury. On March 26, 2000, Plaintiffs' counsel, Marshall Burt, sent this Court an affidavit for Katrina Malone, an employee of the defendant OSI,[1] which called into question the veracity of Malone's previous written statements and deposition testimony in this case. In a cover letter addressed to this Court, Mr. Burt explained that Ms. Malone had called him and told him that OSI personnel coerced her into giving incorrect information both in her written statements and during her January 18, 2000 deposition. Mr. Burt, however, did not suggest a course of action with regard to this serious allegation, instead explaining that he was simply "bringing this information to the attention of the Court." (Appendix A)[2]. On March 29,

---

[1] Outsourcing Collection Services, Inc. (formerly Payco-General American Credits, Inc.) is a subsidiary of OSI. Outsourcing Collection Services, Inc. has a facility located in Schaumburg, Illinois. For simplicity's sake, and because it does affect the disposition of the matter before us, we will refer to the named defendants jointly as "OSI."

[2] Ms. Malone's affidavit and Mr. Burt's accompanying cover letter are attached hereto as Appendix A to this opinion.

2000, after reviewing Ms. Malone's affidavit, the Court issued a minute order requesting defense counsel to file a written response to the affidavit, which counsel did on April 4. In the response, OSI denied that its supervisors coerced or threatened Ms. Malone in any way with regard to her written statements or her deposition testimony. Because Ms. Malone's affidavit, if true, raised questions of, *inter alia*, suborning perjury, witness tampering, coercing testimony, and fraud on the Court, we set an evidentiary hearing for April 26 to determine the validity of Katrina Malone's affidavit.

At the evidentiary hearing, we allowed both parties to present witnesses. Ms. Malone, accompanied by her own criminal attorney, Steven Goldman, testified first. The defendants then presented three witnesses: (1) Don Colasuono, who was formerly employed as a collection manager at OSI; (2) Geralyn Colasuono, Don's wife; and finally (3) Judy Krueger, the production manager at OSI's Schaumburg facility, where the events underlying this lawsuit allegedly occurred. The Court actively participated in questioning each of these witnesses. In addition to these fact witnesses, Beth Golub, defendants' counsel, also took the stand to address issues of professional ethics raised by Ms. Malone's testimony.

The Court hereby enters the following Findings of Fact and Conclusions of Law which are expressly based upon consideration of all the admissible evidence, as well as the Court's own assessment of the credibility of the witnesses. To the extent, if any, that the Findings of Fact as stated may be deemed Conclusions of Law, they should be considered Conclusions of Law. Likewise, to the extent that matters expressed as Conclusions of Law may be deemed Findings of Fact, they should also be considered Findings of Fact.

# FINDINGS OF FACT

1.     Judy Krueger became aware that OSI employees were considering filing a federal lawsuit for sexual harassment against the company in January 1999. On February 8, 1999, Annamarie Quela[3] and Shelby Mignault filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging they had been subjected to a sexually hostile work environment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"). On February 26, 1999, the EEOC issued them the right to sue, and, on March 23, they filed a complaint in this Court. On June 15, 1999 Tabatha Irvin and Michael Hakim also filed charges, alleging Title VII violations, with the EEOC. Ms. Irvin and Mr. Hakim were granted the right to sue and subsequently joined in Ms. Quela and Ms. Mignault's cause of action.

2.     OSI unfortunately placed Ms. Krueger in charge of investigating the allegations of the OSI employees involved in the lawsuit even though she had a clear conflict of interest because she held the highest managerial position at the Schaumburg location. Don Colasuono, the second highest manager in the Schaumburg facility, also aided in investigating the allegations of sexual harassment. Mr. Colasuono also was not an objective investigator because he was and remains a close business partner of the person accused of committing various acts of sexual harassment, George Chaharbakhshi.

3.     In her endeavor to investigate the harassment charges and assist OSI in its upcoming defense of contemplated litigation, Ms. Krueger obtained witness statements from various OSI employees regarding any sexual harassment they or their co-workers were subjected to while employed at OSI.

4.     Ms. Krueger's "investigation" of the plaintiffs' allegations and subsequent written statements were tainted by her personal bias and self-interest in this matter as the head of the Schaumburg facility, and OSI's decision to place her in charge of the investigation was regrettable. Although Ms. Krueger testified at the evidentiary hearing that she only gathered information but did not make credibility decisions, we find this inherently implausible. Additionally, we find it significant that Ellen Gorsuch, who according to Ms. Krueger was the person responsible for making the decision that Ms. Malone could be promoted to supervisor shortly after her return to OSI, was also responsible for reviewing and making credibility decisions regarding the employees' written statements.

5.     As part of Ms. Krueger's investigation, Ms. Malone prepared a total of six, separate, written statements between November 13, 1998 and June 17, 1999, (R. 45, Defs.' Resp. to Malone Aff., Attachs. 1-6), some of which Ms. Krueger claims were unsolicited (and we have indicated them as such below). All but one of Ms. Malone's written statements

---

[3] Annamarie Quela was referred to as "Amy" in Ms. Malone's written statements and during the evidentiary hearing.

were submitted after Ms. Krueger learned about the sexual harassment charges. Briefly, the statements, which were prepared on the dates indicated below, contained the following relevant information:

a.  11/13/98: Ms. Malone recounted her conversation with Ms. Irvin shortly after Ms. Krueger fired her [Ms. Irvin]. Ms. Irvin told Ms. Malone that she was fired for being late to work and was not allowed to make up the time, as she believed she was allowed to. Ms. Irvin recounted to Ms. Malone that she told Ms. Krueger and Mr. Colasuono that "George[4] had her fired because she wouldn't have sex with him [George]." When Ms. Krueger asked why she hadn't said anything earlier, Ms. Irvin responded that she didn't think that Ms. Krueger would believe her.

b.  2/18/1999: Ms. Malone stated that she heard Ms. Mignault jump up from her chair and yell loudly about an obscene voicemail that she [Ms. Mignault] had just received at work. Ms. Malone further stated that Ms. Mignault then talked to Mr. Colasuono and Ms. Krueger for five minutes in Judy's office and left the office, slamming the door behind her.

c.  3/1/1999: Ms. Malone, in her statement, wrote "I . . . have decided that I would tell all I know that has happen [sic] at Payco, the two years and four months that I've been employed." In this statement, Ms. Malone purports to divulge that Ms. Quela would "talk dirty" to another OSI employee "saying things like you can't handle me, I have a deep throat, I like them real big." In addition, according to this written statement, Ms. Quela would sit at her desk and "talk very nasty to all the guys around her." She further stated that Ms. Quela was upset one day because her husband had overheard her on the telephone and thought that she was cheating on him. According to the statement, Ms. Quela seemed to be "trying to get her lies together." In addition, Ms. Malone also discusses Ms. Mignault, whom Ms. Malone stated "use[d] to bother nearly everyone in Payco. Shelby would swear at different collectors [and] threaten them as though she was a guy." Once Shelby pushed Roger, another OSI employee, in the chest, called him "motherfucker[] and saying what she would do to him." At the hearing, Ms. Krueger claimed that this statement was unsolicited.

d.  3/4/1999: Ms. Malone stated that she overheard Gary Wilson talking to Ms. Quela in the smokeroom, saying "don't you let them fuck you, be very careful what you do." Ms. Malone also wrote "Something I forgot to add in my letter was that Amy was always playing and talking to George Charr as well as we all did. She would go to his desk on our late nights and sit for hours at a time . . . . Amy was very

---

[4] "George" refers to George Chaharbakhshi, who, prior to January 1999, was an OSI supervisor, a management position two levels below Ms. Krueger but above Ms. Malone. He is also referred to as "Char" and "Charr." We will refer to him as "Mr. Char."

4

good friends with George Charr. George Charr was the same person with everyone here. He treated and played with everybody the same." Ms. Krueger claimed that this statement, too, was unsolicited.

e.  3/18/1999: Ms. Malone wrote that she was good friends with Mike Hakim and that she did not believe that he was gay. She explained that Mike talked to her privately and said "Katrina I just want to apoligize [sic] to you for being a jerk . . . . I know that everyone hates me now. . . . I really have been different toward people . . . I kinda got mislead into something I really didn't want to be in . . . . I really do like George a lot, and I hate that I have lied on him. . . . I told someone that George tried touching on me, when he was only playing with me. George never tried feeling on me. I hate those guys got me involved." After making Ms. Malone "pinky swear" not to tell anyone, Mr. Hakim divulged that Ms. Quela and Ms. Mignault put him up to telling the lies about Mr. Char. Ms. Krueger was not sure if she asked Ms. Malone to write this statement.

f.  6/17/1999: Ms. Malone's final statement concerns the time period when Ms. Mignault was fired and stormed out of Ms. Krueger's office. Ms. Malone wrote that Ms. Mignault slammed Ms. Krueger's office door, swore at her through the glass window, and generally caused a scene.

6.  Ms. Krueger's testimony that at least two of Ms. Malone's written statements, (statements c and d above), arguably the most damaging to plaintiffs' case, were unsolicited and uncoerced is not credible. We find it incredible that Ms. Malone would voluntarily interject herself into the legal battle between the plaintiffs and her employer by repeatedly making unsolicited statements specifically condemning the actions of those whom she states are her friends. Instead, we believe Ms. Malone's testimony that she was coerced into making the allegedly "unsolicited" statements in an effort to protect OSI from any liability in this lawsuit. We also find it significant that the most damaging statements to plaintiffs' case were obtained after the EEOC had issued its right to sue letter and it was obvious to OSI that this entire dispute would end up in litigation.

7.  Ms. Malone's statements and testimony on behalf of OSI were material to the company's defense. Her statements, perhaps more than any other employee's, helped to discredit the plaintiffs' case because she testified in great detail about incidents which took place at work. In addition, while other employees (mostly men) gave statements helpful to the company's defense, Ms. Malone, as a woman, was an important witness in defending the company in a Title VII sexual harassment suit.

8.  The Court concludes that Ms. Krueger falsely testified that she did not think that she would be responsible for any of the activities that occurred at her facility. This false testimony is directly contracted by her admission that it was her responsibility to prevent any harassment. The Court concludes that Ms. Krueger was not concerned about

preventing or addressing any harassment, but only desired to have OSI avoid liability for any actual harassment that occurred on her watch.

9.     The Court concludes that both Mr. Char and Ms. Krueger knowingly and wilfully pressured Ms. Malone to give false testimony in this case. Both individuals created some of the content in Ms. Malone's false written statements and deposition testimony. In addition, they both gave her cause to be fearful of losing her job if she didn't cooperate. Both Mr. Char and Ms. Krueger talked to Ms. Malone before her deposition and made clear how they expected her to testify. Moreover, it is undisputed that Ms. Krueger was aware of the serious personal and financial pressures Ms. Malone was under regarding her son and knew that Ms. Malone needed to keep her job.

10.    The preponderance of evidence shows that Ms. Malone gave false testimony both in her written statements and in her deposition testimony at the behest of OSI.

11.    Ms. Malone's affidavit and testimony at the evidentiary hearing were credible. Ms. Malone came to this Court and admitted that she made false statements and gave false testimony at her deposition, thereby exposing herself to criminal charges of perjury. We believe that she would not have followed this course unless she were telling the truth both in her affidavit and at the evidentiary hearing. Additionally, the weight of the evidence fully corroborates her affidavit and evidentiary hearing testimony.

12.    The Court does not believe that Ms. Malone had any motivation to lie in her affidavit or at the evidentiary hearing. The Court strongly rejects any suggestion that Ms. Malone is lying now because she was not promoted to supervisor after her rehire on November 16, 1999. Ms. Krueger and/or the company initiated the discussion of promoting Ms. Malone; Ms. Malone did not request the promotion. The Court concludes instead that dangling the promotion before Ms. Malone was meant to create an incentive for Ms. Malone to lie on behalf of OSI.

13.    The Court concludes that Ms. Krueger, contrary to her testimony, talked to her employees about their depositions and coached them as to what they should say. Ms. Krueger, we believe, tried to prove too much in asserting that she only told the employees where to go for their depositions and did not answer any questions or address any concerns they may have had. Specifically, with regard to Ms. Malone, Ms. Krueger stated that she believed Ms. Malone was nervous about her deposition only because of her concern in how to travel to the location where she was to be deposed. Additionally, Ms. Krueger, on cross-examination, maintained her lie that she had not coached OSI employee witnesses by narrowly sticking to the fact that she did not use the word "deposition" when talking to her employees:

Q: So is it your testimony that the only thing you talked to those people about was that they're going to have to be available, and you gave them a specific date?

6

A: As much as I can recall, as much as I can recall, I believe. I know I never mentioned the word "deposition." I don't believe that I did.

(Evidentiary Hr'g at 105.) Ms. Krueger repeated twice more on cross-examination that she had not used the word "deposition" with her employees.

14. The Court flatly rejects Ms. Krueger's testimony as biased, incredible and false. Ms. Krueger was repeatedly impeached in both material and non-material items and was generally evasive throughout her cross-examination. For example, although Ms. Krueger testified at her deposition that she had not spoken to any of the employees prior to their depositions, at the evidentiary hearing, she stated that she had spoken to each of them prior to their depositions and asked them if they wanted to review their written statements. (Evidentiary Hr'g at 94, 119-20.)

15. Ms. Golub, OSI's principal defense counsel, repeatedly told Ms. Malone that she needed to cooperate in the discovery process of this case by giving a deposition. Ms. Golub never threatened Ms. Malone with her job security if she were to decline to testify, and she did not knowingly ignore signs that Ms. Malone was planning to lie during her deposition. Neither Ms. Golub nor her law firm, Seyfarth, Shaw, Fairweather & Geraldson, engaged in any unethical behavior with regard to the present case.

16. Don and Geralyn Colasuono testified regarding a job offer that Mrs. Colasuono made to Ms. Malone. We find that neither of the Colasuonos could have had any knowledge about any private conversations Ms. Malone had with either Ms. Krueger or Mr. Char in which they coached Ms. Malone's testimony. While the fact that one or both of them offered her a position with Mrs. Colasuono's company during the time of the investigation does seem suspicious, we decline to draw any legal conclusions based on their testimony at the evidentiary hearing.

## CONCLUSIONS OF LAW

### 1. What are the Available Remedies?

After reaching our conclusion that Ms. Krueger and Mr. Char intentionally coerced fraudulent written statements and false deposition testimony from Ms. Malone, we next turn to the important task of how to appropriately redress their contumacious behavior. We first reiterate that Ms. Krueger held the highest managerial position at the Schaumburg location, and, as a high ranking corporate official, her actions can be imputed to the defendant, OSI. Thus, we may

properly sanction OSI for its supervisors' wrongdoing. *Cf. Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) (employer held vicariously liable for supervisors' sexual harassment of employee). We also note that we may act *sua sponte* in imposing sanctions on the defendant and need not await a request from the plaintiffs. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 42 n.8 (1991).

Our power to sanction OSI comes from two sources: Federal Rule of Civil Procedure 37 and our own inherent powers. We begin with Federal Rule of Civil Procedure 37(b), which provides for the imposition of sanctions against a party that fails to make disclosure or cooperate in discovery. Under Rule 37(b)(2), if a party disobeys a discovery order, the court can issue an order: (1) providing that "the matters regarding which the order was made or any other designated facts" are taken as established; (2) refusing to allow the disobedient party to support or oppose designated claims or defenses; (3) "dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party;" and/or (4) treating the disobedient party's failure to obey court orders as a contempt of court. In addition to these sanctions, Rule 37 provides that a disobedient party may be ordered to pay costs and attorney's fees caused by its failure to obey the discovery order.

Although the language of Rule 37 requires violation of a judicial order in order to impose sanctions, a formal, written order to comply with discovery is not required. Courts can broadly interpret what constitutes an order for purposes of imposing sanctions. *Brandt v. Vulcan, Inc.*, 30 F.3d 752, 756 n.7 (7th Cir. 1994); *see also Halas v. Consumer Servs., Inc.*, 16 F.3d 161, 164 (7th Cir. 1994) (an oral directive is sufficient if it unequivocally directs the party to provide the requested discovery); *Metropolitan Life Ins. Co. v. Cammon*, No. 88 C 5549, 1989 WL 153558,

at *3 (N.D. Ill. Nov. 7, 1989) (formal order not necessary where party has adequate notice regarding scheduled discovery procedures and fails to comply). The order, or equivalent, serves as notice to a disobedient party that sanctions may be imposed. In this case, although there has been no specific court order, we believe such an order is not required to provide notice that parties must not engage in such abusive litigation practices as coercing witness testimony, lying to the court, and tampering with the integrity of the judicial system. Because all litigants are presumed to know that contumacious conduct of this sort is absolutely unacceptable, we can properly consider the sanctions available under Rule 37. *See United States v. Golden Elevator, Inc.*, 27 F.3d 301, 302 (7th Cir. 1994) ("Lawyers and litigants who decide that they will play by rules of their own invention will find that the game cannot be won."); *Hal Commodity Cycles Management v. Kirsh*, 825 F.2d 1136, 1139 (7th Cir. 1987) ("The Federal Rules of Civil Procedure, as well as local rules of court, give ample notice to litigants of how to properly conduct themselves.").

In addition to Rule 37, a federal court has inherent powers to sanction a litigant for bad-faith conduct. These inherent powers "are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers*, 501 U.S. at 43 (citation omitted). Under their inherent powers, courts have imposed sanctions including shifting attorney's fees and imposing default judgments. *See id.* at 44-45; *Diettrich v. Northwest Airlines, Inc.*, 168 F.3d 961, 964 (7th Cir. 1999) (inherent power "permit[s] a court to impose the ultimate sanction of a grant of judgment (or its equivalent, dismissal with prejudice")).

## 2. Accurate and Truthful Deposition Testimony and Discovery is Fundamental to Our Justice System

Ms. Krueger and Mr. Char's efforts to mislead the plaintiffs and this Court by coercing false testimony strikes at the heart of the judicial system. Lying cannot be condoned in any formal proceeding. *See ABF Freight System, Inc. v. N.L.R.B.*, 510 U.S. 317, 323 (1994) ("False testimony in a formal proceeding is intolerable."). Our legal system is dependent on the willingness of the litigants to allow an honest and true airing of the real facts.

As our colleague Judge Gettleman has stressed: "[p]arties who wish to use the judicial system to settle disputes have certain obligations and responsibilities. One of those responsibilities is to tell the truth in a deposition." *Rodriguez v. M&M/Mars*, No. 96 C 1231, 1997 WL 349989, at *2 (N.D. Ill. June 23, 1997) (dismissed plaintiff's case for lying about her prior criminal record in a deposition). This Court, too, has a responsibility: where we find deliberate falsehoods told in proceedings, we cannot allow such conduct to go unchecked. Turning a blind eye to false testimony erodes the public's confidence in the outcome of judicial decisions, calls into question the legitimacy of courts, and threatens the entire judicial system. *See* Lisa C. Harris, *Perjury Defeats Justice*, 42 Wayne L. Rev. 1755, 1756 (1996).

Our entire civil justice system is dependent on accurate and truthful discovery. Every day, litigants make settlement decisions on the basis of information obtained during the discovery process. Across the country, our fellow judges enter summary judgment in numerous cases on the basis of undisputed facts determined during the discovery process. Ultimately, the discovery process aids parties, who need to proceed all the way through trial to resolve a case, ensure that the trial is based on objective facts and not the parties' selective and subjective recollections about

their respective positions. Therefore, the importance of accurate and truthful discovery to the civil justice system cannot be overstated.

### 3. Default Judgment against OSI is the Only Appropriate Remedy

Given the extreme importance of accurate and truthful discovery, our court system must have zero tolerance for parties who seek to intentionally distort the discovery and trial process. A district court has discretion in imposing sanctions under Rule 37 or pursuant to its inherent power. *Chambers*, 501 U.S. at 44-45; *Metropolitan Life*, 1989 WL 153558, at *2 (citation omitted). Although Rule 37 and the inherent power of the court provide for a wide array of sanctions, in this case, only a default judgment would adequately address the defendants' deliberate and fraudulent conduct.[5] Ordering that the facts at issue be taken as established, (Rule 37(b)(2)(A)), or that certain claims or defenses be unopposed, (Rule 37(b)(2)(B)), would be tantamount to entering a judgment for plaintiffs. While the sanctions of contempt, (Rule 37(b)(2)(D)), or imposing reasonable expenses, (Rule 37(b)(2)), might punish the wrongdoers personally, it would insufficiently punish the gross abuse of process exhibited by OSI and its employees. Ms. Krueger and Mr. Char's behavior, as revealed by Ms. Malone, casts doubt on every single representation made by the defendants in this action. None of these other options is severe enough to deter this type of conduct in the future whether by these defendants or other litigants. Thus, this Court, in the exercise of its discretion, easily concludes that a default judgment on all issues of liability is the only appropriate sanction to deal with the defendants' behavior in this case.

---

[5] If default is merited, a court need not first impose lesser sanctions; *i.e.* there is no need to fire a "warning shot." *Halas*, 16 F.3d at 165.

11

We are mindful of the requirement that sanctions "be proportionate to the circumstances surrounding the failure to comply with discovery." *Crown Life Ins. Co. v. Craig*, 995 F.2d 1376, 1382 (7th Cir. 1993). But, we may "presume proportionality where there are wilful or bad faith violations of discovery orders. The same presumption applies when there is a pattern of contumacious conduct or dilatory tactics or the failure of less drastic sanctions." *Id.* at 1383. Here there is no question that the defendants acted wilfully and with bad faith: they coerced an employee to lie about the central issue in order to win this case. The sanction of default judgment on liability is proportionate to the defendants' egregious conduct. It is also appropriate to enter liability judgments in favor of all the plaintiffs because the defendants sought to use Ms. Malone's false statements and testimony to influence the outcome of all of the plaintiffs' claims in this lawsuit.

Furthermore, we find that default judgment is the only appropriate remedy under the inherent power of the court. Our choice between default and lesser sanctions is a product of three considerations: (1) prejudice to the plaintiffs; (2) prejudice to the judicial system; and (3) deterrence and punishment. *Robinson v. Midlane Club, Inc.*, No. 94 C 1459, 1995 WL 453057 at *6 (N.D. Ill. July 28, 1995). The defendants' conduct shows such blatant contempt for this Court and a fundamental disregard for the judicial process that their behavior can only be adequately sanctioned with a default judgment. Entering a default judgment will send a strong message to other litigants, who scheme to abuse the discovery process and lie to the Court, that this behavior will not be tolerated and will be severely punished. *See Brady v. United States*, 877 F. Supp. 444, 453 (C.D. Ill. 1994) (quotations omitted) ("Permitting this lawsuit to proceed would be an open invitation to abuse the judicial process. Litigants would infer they have

everything to gain, and nothing to lose, if manufactured evidence is merely excluded while their lawsuit continues. Litigants must know that the courts are not open to persons who would seek justice by fraudulent means."). We recognize that default is an extreme sanction, but "[c]ourts should not shrink from imposing harsh sanctions where they are warranted." *Altschuler v. Samsonite Corp.*, 109 F.R.D. 353, 357 (E.D.N.Y. 1986); *See also Hal Commodity*, 825 F.2d at 1139 ("While the entry of a default judgment should be used sparingly, we see no need to impose a requirement that prevents a district court from imposing that sanction if, under the circumstances, it is warranted.).

## CONCLUSION

The preponderance of the evidence establishes that OSI supervisors knowingly and intentionally coerced fraudulent statements and deposition testimony from Ms. Malone. Because of OSI's deliberate and calculated efforts to distort the discovery process, we hereby enter judgment against it on liability.

The Clerk of the Court is directed to enter judgment on liability in favor of all the plaintiffs against the defendants. The Court will retain jurisdiction of this case for the sole purpose of determining the appropriate damages to be awarded to each plaintiff. A jury trial on the sole issue of damages is hereby set for July 17, 2000. The parties are also free to waive a jury trial and have the Court determine the appropriate damages for each plaintiff. A status hearing will be held in open court on June 1, 2000 at 9:45 a.m.

13

The defendants' motion for summary judgment on the plaintiff Michael Hakim's claims, (R. 48-1), is hereby denied as moot.

Finally, the Court hereby notifies the parties that it will send a copy of this opinion to the United States Attorney's Office of the Northern District of Illinois for any appropriate criminal investigation.

ENTERED:

**Judge Ruben Castillo**
**United States District Court**

**Dated: May 17, 2000**

LAW OFFICES OF

# MARSHALL J. BURT
77 West Washington Street
Suite 1306
Chicago, Illinois 60602

Telephone (312) 419-1999

Facsimile (312) 456-0237

March 28, 2000

Honorable Ruben Castillo
U.S. District Court Judge
219 South Dearborn Street
Suite 2319
Chicago, IL 60604

RE:    Quela et al vs. Payco-General American Credits et al.
        Case No. 99 C 1904

Dear Judge Castillo:

On January 18, 2000 I, as counsel for the plaintiffs, took the deposition of Katrina Malone, an employee of the defendant. Following the deposition, Ms. Malone called and advised me that her employer had coerced her, with threats of termination, into giving deceptive, inaccurate, misleading and incomplete information in her written statements and during her recent deposition. A copy of Ms. Malone's Affidavit attesting to this information is enclosed.

Pursuant to Rule 1.2 (h) of the Rules of Professional Conduct, I am bringing this information to the attention of the Court because the conduct described by Ms. Malone may constitute witness tampering and a fraud on this tribunal. I am also giving a copy of this letter and the enclosed Affidavit of Katrina Malone to the attorney for the defendants.

Sincerely,

Marshall J. Burt

MJB:dl
cc:    Beth Golub, Esq.
        Attorney for the defendants

**Appendix A**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ANNAMARIE QUELA, SHELBY MIGNAULT, TABATHA IRVIN and MICHAEL HAKIM, | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 99 C 1904 |
| vs. | ) ) | |
| PAYCO-GENERAL AMERICAN CREDITS, INC. and OSI, INC. | ) ) ) | Judge Ruben Castillo |
| Defendants. | ) ) | Magistrate Judge Morton Denlow |

## AFFIDAVIT OF KATRINA MALONE

I, Katrina Malone, having been duly sworn under oath, hereby deposes and states as follows:

1.    My name is Katrina Malone. I make this affidavit based upon my own personal knowledge of the facts contained in this affidavit and, if called as a witness, could competently testify thereto.

2.    I make this statement of my own free will and am signing this affidavit voluntarily. None of the plaintiffs or their attorneys initiated contact with me or in any means prompted me to make a statement.

3.    My present employer is OSI, formerly known as Payco General American Credits. I am currently employed as a collector and have worked for the company for several years.

4.    On or about March 8, 2000, I contacted Michael Hakim (hereinafter "Hakim") at his employment and requested that he provide me with his attorneys' telephone number. Hakim said he did not have the number available. No further discussion followed with Hakim.

*K.M.*

5. On or about March 9, 2000, after locating the telephone number for plaintiffs' counsel, I voluntarily contacted attorney Marshall J. Burt, the attorney that had questioned me during my deposition on or about January 18, 2000.

6. I stated to Mr. Burt that I had provided misleading, inaccurate and incomplete testimony during my deposition. I stated that my employer OSI had instructed me, with the threat of termination, that I provide misleading, inaccurate and incomplete testimony. Moreover, I stated that OSI management promised me a promotion if I testified at my deposition consistent with the information previously told to me by management.

7. I requested Mr. Burt to meet me at my home in Schaumburg, Illinois to discuss the matter further.

8. On or about March 12, 2000, Mr. Burt along with Andrew Cohen, who was introduced as a colleague of Mr. Burt, arrived at my home pursuant to my request. I provided a detailed oral statement of what OSI management instructed me to do and the resulting affect on my earlier statements and deposition testimony. I agreed to sign a sworn statement confirming the information I provided during this conversation.

9. Mr. Burt and Mr. Cohen have never offered or promised anything in return for my earlier statement to them or my present testimony in this affidavit. None of the plaintiffs have offered or promised anything in return for my statements. I explained that I was voluntarily coming forth to set the record straight.

10. I am voluntarily and without coercion, duress or threat of any kind, providing this sworn statement to avoid an injustice in the present matter. I have not been offered or accepted anything in return for providing this statement.

K.M.

11.  Substantial portions of my deposition testimony were incorrect, misleading, inaccurate and incomplete. I was threatened by the company, namely the office manager Judy Kreuger (hereinafter "Kreuger"), that I would be terminated if I did not provide the testimony as they previously directed. Sometimes I was explicitly told by Kreuger that my job was on the line and other times the threat of termination was implied. Moreover, I was promised a promotion to a higher paying supervisory position if I testified as the two of us, Kreuger and myself, had previously rehearsed.

12.  I believe I would have been terminated by the company if I did not make the earlier written statements and provide deposition testimony as they specifically instructed me to answer.

13.  During the relevant time periods, I needed my job in order to provide financial support to my two sons and daughter, as well as my own financial obligations. Company management was aware of the support I provided to my children.

14.  Furthermore, when I wrote the earlier statements for George Char (hereinafter "Char"), a manager, and Kreuger, I was concerned with my personal safety from Char. I had previously heard Char make threats of physical violence to individuals who did not do what he wanted.

15.  The written statements I had previously provided during the company's investigation into the plaintiffs' claims of harassment contained false information which I was directed to write by Char and Kreuger. These managers would instruct me what to write, sometimes word-for-word. When I disagreed with the information being dictated to me, they told me just to write what they said.

16.  Frequently, I would have to rewrite my written statements because Kreuger and Char would tell me more information which to place in the statements. After I wrote the newer statements, either Char or Kreuger would destroy the old drafts.

*J.H.*

17.	At times, Char would say, "oh, don't you remember . . . " and then refer to an event which supposedly took place in the past. When I would respond by saying I don't remember that happening, he instructed me to put it in my written statement anyway. At other times, Char and Kreuger directed me to write about incidents that occurred when I was not even physically present in the office to witness.

18.	I never offered to write any statements in response to the investigations occurring at the office. Rather, Kreuger and Char would instruct me to write statements making the plaintiffs appear to be untruthful or active participants in the events which are alleged to have occurred at OSI.

19.	For instance, in the statement I wrote on March 1, 1999, Char dictated the comments supposedly made by Annamarie Quela (hereinafter "Quela"). Char told me to write that Quela "would always talk dirty to Dee saying things like you can't handle me, I have a deep throat, I like them real big asking Dee to show her his penis." I never heard Quela make such statements or anything similar.

20.	I never heard Quela use statements that she engaged in sex, oral sex or any other sexual references in the workplace. I was specifically instructed to say these remarks at the insistence of Char and Kreuger.

21.	I never heard Shelby Mignault make any sexual statements or similar references in the workplace. I was specifically instructed to say these remarks at the insistence of Char and Kreuger.

22.	Tabatha Irvin (hereinafter "Irvin") sometimes would tell me to watch Char because he was staring at her and following her every move. On one occasion, Irvin told me to watch Char as she got up to use the restroom. Moments later, I saw Char get up and leave. I did not

follow Char, but he was walking towards the bathrooms. When she returned, Irvin was upset and stated that Char cornered her in the hallway near the bathroom.

23.   Irvin frequently called me on my phone extension and told me that Char wants to go out and have an affair with her. Irvin stated that Char wanted to have sex with her in an empty house that he was acting as a realtor for and at the nearby hotel, which I believe is named the Hamilton Inn.

24.   I am aware and have observed that Char kept a black whip in his desk drawer. I believe the existence of this whip was common knowledge in the workplace.

25.   I heard Char frequently refer to some women, including Paula Levin, as "fat bitches." I also observed Char using the word "bitch" when referring to women on other occasions.

26.   I heard Char call Hakim a "pussy". Other employees near Hakim called him names such as faggot and pussy. In return, Hakim would sometimes return the insults.

27.   I have observed Char slap Hakim on the back.

28.   I heard Hakim complain to Char about being called names by the other collectors and Char said, "you are a punk, go sit down, you can sit there with the guys and play around but you don't want them to play with you. Get out of my face, go sit down." I never observed Char do anything to stop the name calling and insults.

29.   I never observed Char stop the male employees from making unprofessional jokes and comments in the office. Often, he would just join in laughing.

30.   In mid 1999, Char, Don Colosuono (hereinafter "Colosuono") and Michael Langer, all managers, left the company to start their own business. Around that time, Colosuono tried to set me up in a job with his wife's company. Don approached me and said he wanted me to go work for his wife and that I would be paid good money. The following day Char called

me and said he is setting up an interview between myself and Ms. Colosuono at her office, Corporate America Family Credit Union. Char said that he wanted me out of OSI now that he was leaving. Char explained that he and Colosuono told his wife about me and that she liked what she heard.

31. I went on the interview for the job. When I returned from the interview at the Credit Union, Char called me and said you got the job. The following morning Colosuono's wife called and also told me I got the job. I did not accept the position. I was concerned about their motives in getting me a job and what I would have to do for them in the future. I never requested Char or Colosuono to find me a job and believe they just wanted to buy my silence about what occurred at the company in the past.

32. On or about October of 1999, I voluntarily separated from the company to attend to and assist my son. At that time, I was frustrated by the pressure management put on me regarding the sexual harassment claims and management's false promises. As such, I announced out loud on the floor that "I was tired of having to lie for the company and I wouldn't do it anymore."

33. On or about November of 1999, needing the income, I returned to work at the company. For a short while, management did not impose any new requirements on me in relation to protecting them from the allegations of harassment. This changed as my deposition approached.

34. During the time period prior to my deposition, Kreuger would frequently call me into her office to discuss my deposition testimony. She would tell me what to say and show me the statements they previously had me write. She told me to testify exactly to what they had previously instructed.

*[signature]*

35. Kreuger also added that I should testify that Char was not able to discipline, hire and fire other employees. When I told her that since I worked at the company, Char was able to take such action, she said I was wrong and never to testify to that belief.

36. Prior to my deposition I called and spoke to Kreuger. I told her I did not want to testify and that the company knew what it did. When I persisted, Kreuger told me "this is your job and you have to testify. You have no other choice." Kreuger then said that as soon as I return to work after my deposition, I would be made a supervisor.

37. Prior to my deposition, Kreuger called me into her office and called an unknown Human Resources person. While on speakerphone, Kreuger asked if it would damage their case or defense if I was made a supervisor at the time. The women responded that she didn't think it was a problem. However, after my deposition, I was never given the supervisory position.

38. Char called me just prior to my deposition and stated that I should say "Tabatha was a bitch and a whore and that she always flirted with people." Char had left the company about six months before in about August of 1999. I was concerned about my safety that Char knew when my deposition was scheduled.

39. In the early part of 1999 when George Char found out about Irvin's lawsuit, he said "Tabatha is the type of person where her parents will find her head floating in the river and they wouldn't even know what happened to her." Char also said "he would cut Tabatha's tits off and throw them in a river." I took Char's comments as a threat.

40. Char stated on more than one occasion that "you guys don't know the type of person I am, I'm capable of a lot of things and I could have things done and you wouldn't even know what happened to you." I took these comments as a threat.

41. From the time I began working for Payco up through the time I left, I believe Char had the power to discipline, hire and fire employees. I have observed Char fire employees. For instance, I saw Char fire a man named Chris because Chris liked Irvin.

42. I have carefully reviewed my affidavit and agree that it is true and accurate.

Further Affiant sayeth not.

_Katrina Malone_ Date 3/26/2000
Katrina Malone


## VERIFICATION BY CERTIFICATION

Pursuant to 28 U.S.C. § 1746, the undersigned certifies, under penalty of perjury that the statements set forth in the foregoing Affidavit of Katrina Malone are true and correct, except as to matters therein stated to be on information and belief, and as to such matters the undersigned certifies as aforesaid that she verily believes the same to be true.

_Katrina Malone_ Date 3/26/2000
Katrina Malone